BALTZER, Respondent, vs. THE CHICAGO, MADISON & NORTHERN RAILROAD COMPANY, Appellant. ·

*October 31 — November 15, 1892.*

*Railroads: Negligence: Injury to brakeman: Contributory negligence: Court and jury: Instructions.*

1. The plaintiff, a brakeman, was injured while riding on the pilot of an engine and about to couple the engine to cars on a spur track. Upon the evidence it is *held* that the question whether the accident was caused by the running of the engine at a dangerous rate of speed up to within a few feet of the cars and its sudden reversal at that point, whereby plaintiff was thrown forward and caught between the bumpers, or whether plaintiff accidentally, and without fault of the engineer, lost his balance while reaching forward to make the coupling, was properly a question for the jury.

2. There being no evidence that the defective condition of the spur track was the proximate cause of the injury, instructions which left it to the jury to determine whether such condition was the cause, are *held* erroneous.

3. An instruction that " where a plaintiff is compelled to act at once in the presence of imminent danger, he cannot be held guilty of contributory negligence, as a matter of law, merely because he did not choose the best means of escape," was improper in this case, since, as applied to the facts, it left the jury to conclude that if plaintiff chose the best means of escape which occurred to him, this fact might relieve him from the consequences of the contributory negligence, if any, by which he was brought into the dangerous position.

APPEAL from the Circuit Court for *Green* County.

The plaintiff sues to recover damages sustained in consequence of an injury received by him August 27, 1889, while

Baltzer vs. The Chicago, Madison & Northern R. Co.

in the employ of the defendant company as a brakeman on its freight train, whereby his left arm was crushed, rendering amputation near the shoulder necessary, caused by the alleged negligence of the defendant and of the engineer in charge of the locomotive. The complaint charges that at the time the defendant's engineer, operating the engine, carelessly and negligently ran it over a spur track at an unusual and fast rate of speed, and was inattentive to his duties at the time; that the plaintiff, when the engine reached the cars, proceeded to couple said engine onto said cars, and, while he was in the act of coupling the pilot bar of the engine to the coupling head of the car, said engine being in motion, and the cars standing still, suddenly, and without warning to the plaintiff, the engineer carelessly and negligently checked the speed of the engine to such an extent as to throw the plaintiff forward, by reason whereof he was unable to protect himself, and failed to make the coupling, and was caught between the bumping post of the engine and the bumping post of the car, without any negligence on his part, whereby his arm was crushed, etc.; that the accident was caused wholly by the negligence of the engineer and co-employee of plaintiff, and by the carelessness and negligence of defendant in allowing the side track to be in such an unlevel and ill-laid condition, and out of repair, and of unnecessary grade, it having been constructed by laying the ties and rails on the top of the ground without any grading, ballasting, or leveling, about 300 feet on the east end having an unnecessarily steep grade, running down for about 100 feet and then up for about 200 feet, and in going on the spur from the west to the east the grade being three and one-half or four feet in 100 feet, as it was alleged.

The spur track had been put in about four weeks before the accident to carry stone and other materials for building a cheese factory at its eastern end, and the company had been

bringing stone on its road from a point fourteen miles
north, on its freight train, reaching Monroe at 6:30 p. m.,
and returning at 4:15 a. m., each day, and two or three
cars of stone were daily run into the east end of the spur
track, where during the night they were unloaded, and on
the return of the train the next morning the unloaded (flat)
cars were drawn out by the locomotive, and put into the
train on the main track, to be taken north and loaded
again.   The evidence tended to show that the ground on
which the track was laid had been to some extent filled
and graded and leveled at the time of fitting up the depot
grounds, and later, at the time of digging the cellar of
the creamery or milk factory, and on this ground the ties
were laid, the rails spiked to them, and the track had been
pulled, pushed, and propped into line and position, and
about six inches of ballasting along the depression in the
spur track had been tamped in under the ties, leaving
them for the most part above ground.   Evidence was
given tending to prove that the grade of the spur track
was much less than alleged.

The plaintiff was in the twentieth year of his age, and
had acted as brakeman for nearly two years, on different
sections of the road, and had so acted on the Monroe sec-
tion, to which he returned eight days before his injury, and
acted as front brakeman on the train in question, carrying
stone upon each trip on flat cars, and leaving them daily
on the spur in question, and he had been down over the
spur two or three times.

The evening before the accident they had put three flat
cars, loaded with stone, in on the spur track; and, after the
engine had pushed them to the east end, the plaintiff set
the brakes on them, and pulled the coupling pin, and left it
on the top of the car, and rode out on the engine.   When
the train returned the next morning to take in these cars,
it was not daylight, but the headlight was giving a good

light.   The cars in the train were left below the switch, and the engineer, fireman, and the plaintiff ran east on the spur to couple onto the three cars with the pilot drawbar in front of the engine, to draw them out and put them in the train to go north.   The plaintiff rode down the spur on the engine pilot, having his left foot between the two lower pilot bars, with his lantern on his right arm and his left hand on the upper part or shoulder of the pilot.   As he approached the cars he stepped forward and put his right foot in the notch or toe of the pilot, for that purpose, and raised the pilot bar, weighing about seventy-five pounds, with his left hand, still having his lantern on his right arm, prepared to make the coupling with his right hand.   He testified further that in his judgment "the engine was going at the rate of about six miles an hour; and when I saw the cars I called to the engineer,— just made a shout, as we often do, not in words,— to draw his attention to the cars and have him slow up.   He did not slow up, as I expected he would, and when we got near the cars — I can't say how near — he reversed his engine suddenly; and that overbalanced me, and threw me forward, and the engine followed.   The pilot all went under the car.   The car struck me in the breast, and knocked me back with my back on the pilot and the drawbar, and the car and bunting post on the engine came together, and caught my arm and mashed it so that the bones came out through my sleeve. Could not say how far we were from the cars when I picked up the drawbar.   Was within perhaps thirty or forty feet of the cars when I first saw them.   When I next looked, I discovered the coupling pin was in the drawhead of the car, so that I could not make the coupling until it was drawn. I was then probably from two to four feet of the car. Don't know what prevented me from seeing it before, unless it was the darkness.   I was looking for it all the time. Could not see it when I first saw the end of the car.   I

stood there looking for the car, not for the pin particularly. Nothing else but the reversal of the engine tended to throw me off my balance. I was not trying to draw the pin. I knew I had to do it to make the coupling. *Question.* Were you not in the attempt to draw the pin at the time? *Answer.* That I don't know. I had it in mind. If I wanted the engineer to stop it I could signal him with my lantern, with an up and down motion. That was the stop signal. Shouting as such signal is frequently done, but it is not in the regulations." The regulation says: "All employees, when coupling cars, must be very particular to notice the speed at which cars are moving when coming together to be coupled. . . . It is dangerous to uncouple or couple, *or attempt to place links or pins or drawbars,* while cars are in motion, and *is strictly forbidden.*"

The plaintiff, in his deposition, testified that it was customary to stand on the ground when making a coupling, and that at the time he reached over to pull the pin with one hand; that it would have been his duty to see that the pin was in its proper place, if the engineer had stopped to let him off. The conductor, Farnham, testified that, right after the plaintiff was hurt, he told witness that at the time he was injured he was trying to pull the pin. Ingraham, the fireman, testified that the plaintiff, right after the injury, when on the ground, told him that he was reaching for the pin in the drawhead on the car at the time, and lost his balance and fell down,— that he raised out the pin and lost his balance,— and he testified that he (witness) was at the tender brake when the engine and car came together, and when the engine stopped. That if the engine struck the car he did not know it. "It was so light you could not feel it. Were going very slow." At that time the signal to stop at night was an up and down signal with a lamp. That the engineer did not reverse the engine when within two to four feet of the end of the flat car, and there was

no jerk from any cause when within that distance, or even
ten feet of the car.   That the engineer reversed the en-
gine when at the plank crossing where the down grade
commences (about 150 or 200 feet west from the flat cars).
That he did not reverse it again.   That he stood where he
could see what Platt, the engineer, did, and the engine
went down the spur after it was reversed at about the rate
of two miles an hour.  That was very slow.   Ryan, the
rear brakeman, also testified that the plaintiff told him that
he was going to reach for the pin, and he got overbalanced.
Dana, who had been an engineer on the Illinois Central
Railroad for twenty-three years, testified that the railroad
company has a code of signals which are communicated to
the men in its employ.   They learn them from the time
cards with which the men are supplied.   The signals are
given by the hand in daytime, and by lantern in the night.
  As to the proper way for the plaintiff to have made the
coupling, several witnesses experienced in railroading testi-
fied.   Farnham, the conductor, testified that it would be
to see first that the pin was out of the bunter.   For the pin
to be in proper position, he should raise it up to the top of
the bunter, tip it back a little bit, so when he put the draw-
bar in the bunter it would fall down.   He could do that
while the engine was approaching.   He could run ahead
and fix it and get back on the engine again, or he could
stop the engine and fix it.   W. H. Stein testified the same,
in substance, and said if the engine comes very slow he
should make the coupling; if too fast, he should signal it
to slack up.   Under the facts stated, he said: "I think the
safe way to make that coupling would be for the brakeman
to go ahead of his engine to see that his pin was set; if the
engineer kept coming on, to give him a signal to stop; and,
after he got his pin set, to signal him to go ahead, and
raise his drawbar and enter it into the bumper, and put the
pin down."   S. J. Carter testified: "The pin should be set

before you undertake to make the coupling. I should consider it very dangerous for a brakeman to attempt to make the coupling when the pin is not set; the engine moving towards the car. The duty of the brakeman would be to go ahead of the engine with a lantern, and give signals to the engineer to come forward, and make the coupling in that way." It was not claimed that the plaintiff gave any signal to the engineer, except as he shouted, as before stated.

·The engineer, Mr. Platt, testified that he reversed the engine just as it started down the grade. " The fireman set the tank brake, and I had to hold her. The speed was then about three miles and a half an hour, and by the time she got down to the car the speed was reduced so that I don't think she was going more than one mile an hour when within a few feet of the car. I shut off the steam before I reversed the engine, and did not give her any more. Didn't see plaintiff make any signal nor hear him shout until he was struck. Did not hear him say anything. After he was struck, I backed the engine up four or five feet, blocked the wheel with a stone, and gave her a little steam to hold her. It was down grade, and the tank brake would not hold her. Asked him how he came to get hurt. He told me when we were approaching the car he had the drawbar in his left hand, and he reached so far ahead with his right hand to pull the pin in the drawbar of the car that he lost his balance on the pilot, and slipped and fell. I did not know that the engine touched the car at all until I heard him holloa. I had my hand on the throttle, and was standing with my face to the window. Did not change my position after that until he was hurt. If a signal had been given, I would have seen it. I was watching. I should think I was one hundred and fifty feet from the cars when I first saw them,— saw them distinctly. I knew what was the proper rate of speed, and that it was neces-

Baltzer vs. The Chicago, Madison & Northern R. Co.

sary to go up to the cars slow. It was his place, when he saw that he could not make the coupling, to give me a signal to stop; and I could have done that immediately, in a very short distance. I could have given her steam and sent her back,— stopped her before she went up to the car; and he could have got off, if he wanted to. I knew just about how to handle it to stop it, and had no difficulty in controlling it. Nothing interfered in any way. Everything was handy." There was no testimony to contradict this last statement, or tending to show that he could not have controlled his engine, or that the irregularities or defects in the track interfered with his control of it or his ability to stop it. The proof was uncontradicted that, in coupling and switching cars out and into trains, the front brakeman commands the engineer, whose duty it is to obey his signals.

The plaintiff denied, in the main, making the statements testified to by the defendant's witnesses, as to the manner in which he received his injury, and said that on this occasion he had done just as he had been always taught to do, and that he had no difficulty in riding on the pilot at the time; that it is customary to make couplings when standing on the ground; that the engine was running, as he thinks, at the rate of six miles an hour until it was reversed, which was when it was within two feet or more or less of the flat car; and that he shouted when it was within from fifteen to thirty feet.

The defendant moved the court at the close of the testimony to direct a verdict for the defendant, on the ground that the plaintiff was guilty of contributory negligence, but this was denied and the defendant excepted. The engine was of the weight of thirty-six tons, and did not have an air brake. Platt further testified that it was the plaintiff's duty, when he saw that the pin was in the drawhead, to signal him to stop, to have got off and set the pin, and to

have had it in place before the engine came up to the car. A survey and plan of the spur track and grounds on which it was built were proved and given in evidence. Six or seven witnesses testified very fully as to the alleged defects in its construction and condition, and that it was imperfectly constructed, and that there were very considerable irregularities in the grade. The evidence was quite voluminous, but the foregoing presents its general features and more salient points.

The circuit judge, in his charge, called attention particularly to the two charges of negligence, to wit, that of the engineer, and of the company in not properly constructing the spur track, as *the real issues* to be determined by the verdict, which was excepted to by the defendant; and he further charged that it was not enough that the defendant was negligent; that if the plaintiff was not in the exercise of ordinary care, and this contributed to the injury, he could not recover, even though defendant was negligent. The charge was full as to the subject of negligence, and particularly as to the negligence of the engineer, and all proper instructions asked by the defendant appear to have been embraced in the general charge. The circuit judge further charged the jury that "it was a duty imposed by law upon the defendant corporation to provide a reasonably safe and convenient roadbed and track where the plaintiff in its employ was required to work, and keep the same in reasonably safe condition; and if it neglected this duty, and in consequence of such neglect the plaintiff was injured while in the exercise of ordinary care and without negligence on his part directly contributing to such injury, then the defendant is liable in damages to him for such injury, and your verdict must in such case be for the plaintiff. A railroad company is not bound to keep its track in such a state of repair as to insure the safety of its servants." To which the defendants excepted. " A railroad company does

Baltzer vs. The Chicago, Madison & Northern R. Co.

not guaranty the safety of men in its employ. On the contrary, it is a well-settled rule of law that a servant on entering its service accepts and assumes the ordinary hazards and dangers of his occupation, such as are incident to it; and for an injury sustained through such danger he cannot recover. It is the duty of the employee, without warning, to observe due care, and any omission to do this is at his own peril. When he is employed to work in a service of peril, if the danger belongs to the service in which he engages, he assumes the ordinary risks which are incident to it. But he does not assume the risks arising from the negligence of the defendant in failing to provide a suitable roadbed and track, or assume the risks arising from the negligence of an engineer of the defendant. It is provided by the statutes of this state that 'every railroad corporation doing business in this state shall be liable for damages sustained by any employee thereof within this state, without contributory negligence on his part, when such damage is caused by the negligence of any train dispatcher, telegraph operator, superintendant, yardmaster, conductor, or engineer, or any other employee who has charge or control of any stationary signal, target point, block, or switch.'" To which instruction the defendant excepted, and especially to that portion beginning with the words, "but he does not assume," down to and including the words, "engineer of the defendant."

The jury found a general verdict, assessing the plaintiff's damages at $10,000, upon which judgment was rendered in favor of the plaintiff, a new trial for alleged errors in the judge's charge to the jury, and for other causes, having been denied.

For the appellant there was a brief by *P. J. Clawson,* attorney, and *B. J. Stevens,* of counsel, and oral argument by *Mr. Stevens.*

For the respondent there was a brief by *John D. Dun-*

*widdie*, attorney, and *A. S. Douglas* and *B. F. Dunwiddie*, of counsel, and oral argument by *John D. Dunwiddie* and *B. F. Dunwiddie*.

PINNEY, J.   1. It is manifest that the evidence of the negligence of the engineer in running the engine on the spur track at an unsafe rate of speed, on the occasion when the plaintiff was riding on the pilot with a view to couple the drawbar of the pilot to the flat cars, required the sub-mission of the case to the jury.   Whether the accident was caused, as the plaintiff testified, by the sudden reversal of the engine, whereby he was thrown forward and caught and his arm crushed, as he describes, or. whether he ac-cidentally and without fault of the engineer lost his balance while holding the drawbar and reaching forward to draw the pin or to attempt to make the coupling, was a question for the jury, as well as the question whether the engineer ran the engine at a dangerous rate of speed up to the point where the plaintiff claims he suddenly reversed the engine, and within a few feet of the flat cars.   The motion for a nonsuit was, we think, properly denied.   Whether the evidence of negligence on the part of the plaintiff, oc-curring at the time and directly contributing to his injury, was so clear and decisive as to warrant the court in with-drawing the case from the jury and directing a verdict for the defendant, it is not necessary now to decide.   We think that it may be fairly claimed that the evidence of contribu-tory negligence on the part of the plaintiff was such, at least, that different minds might well come to different con-clusions in respect to it, and as to whether the plaintiff should or should not recover.

We think, however, that the judgment of the circuit court should be reversed for error in the instructions to the jury.   The evidence is undisputed that the engineer is under the command and control of the brakeman while en-

gaged in coupling and switching cars in or out on side or
spur tracks, and is bound to obey his signals. It is clear
that the plaintiff did not give him any signal such as the
code of signals and course of business required, although he
was, as his testimony shows, fully conscious of the rate of
speed at which the engine was running, and although he
shouted, merely, the engineer testified that he did not hear
him; and he was, as he says, looking out and attending to
his duties. The proper signal was by a motion in the
night-time of the lamp or lantern, and in daylight with the
hand. It is true that the plaintiff says that at times they
shouted, instead of making signals such as the code re-
quired; but employees, in doing so, took great risk of the
signal not being heard or understood. The code, requiring
signals to be such as are addressed to the eye instead of the
sense of hearing, is no doubt founded on long experience,
and upon the ground that one addressed to the eye is much
more certain and likely to be understood than one at-
tempted to be conveyed by sound of the voice, which may
not be heard or understood, in consequence of the noise of
the engine and cars in motion, and the escape of steam.
Again, the evidence shows, not that it is dangerous to ride
on the pilot when going at the rate of speed mentioned,
but that it is dangerous to attempt to make the coupling
under the circumstances stated; the pin not having been
properly placed, but being in the drawhead of the flat car,
so that the coupling could not be made without it being
first withdrawn. The rules required the plaintiff to "be
very particular to notice the speed at which cars are mov-
ing" when coupling, and, "if moving at a *dangerous* rate,
no attempt must be made to couple by going between the
cars;" and it was further declared that "it is dangerous
to uncouple, *or attempt to place links or pins or drawbars,*
while cars are in motion, and *is strictly forbidden.*" The
plaintiff's testimony shows that on this occasion it was his

duty to have known that the pin was properly placed, so as to safely make the coupling, or to have himself placed it there. He had the right, by proper signal, to regulate the speed of the engine, and even to stop it, so that he could place the pin and make the coupling in a safe and prudent manner. He took the risk of doing what his employer had forbidden him to do, and disregarded the observance of methods calculated to secure his safety, as shown by experienced railway employees long familiar with such work.

It is argued that the witness Stein, in his testimony, justified the course pursued by the plaintiff. He said it " was safe to ride on the pilot before he made the coupling, if it didn't strike anything; that it was perfectly safe to ride on the pilot going down the side track, but when he found the pin was not set he should have stopped the engineer. To make the coupling safely, it was his duty to know that the pin was in the proper position before he attempted to make it, and before his engine arrived there." He also said: " It was the duty of the engineer to slow up without a signal, so that the coupling could be made in safety." " I should say it was a dangerous thing to make a coupling of the front of an engine to a car, riding on the pilot; the pin in and the engine moving. The danger consists in the fact that he cannot make the coupling unless he attempts to raise the pin just as he enters the drawbar. I should think it would take his attention away from one place to another, from where he was going to enter the drawbar to where he was going to catch the pin, and he is liable to let his drawbar, from the weight of it, swing below the hole and strike the lower lip and glance down." The witness Carter testified that he had made couplings under the circumstances described, but said: " It would be dangerous to attempt to make the coupling when the pin is in the hole with the drawbar in my hand. The danger consists in your being liable to hit the drawbar, or be thrown under the engine or

car, if you didn't happen to make it.   If you cannot get the
pin out in time, you are liable to let the drawbar drop and
the pilot run under the car and crush a man,—throw him
off the pilot, and be run over by the engine." If it was the
duty of the engineer to slow up without a signal, his failure
to do so might not justify the brakeman in neglecting to
give a signal until it was too late to be effective.

It is difficult to distinguish this case from *Lockwood v. C.
& N. W. R. Co.* 55 Wis. 50, 66, in which this court said:
"If he voluntarily placed himself in a dangerous position,
not required of him by the rules of the company or by the
order of some superior officer or employee, and was injured
while in such position, even though the negligence of the
company was one cause of the injury, he cannot recover,
because his placing himself in such dangerous position was
also negligence on his part, and contributed to the injury."
*Wolsey v. L. S. & M. S. R. Co.* 33 Ohio St. 227.   And many
other cases might be cited to this effect.

It is apparent from these considerations that the ques-
tion of the existence of contributory negligence, under the
evidence, to say the least, was a fairly close one.   Whether
the effect of his conduct may not be controlled or materi-
ally modified, in view of the conflict of evidence as to the
speed of the engine, and evidence that it was the duty of
the engineer to have slowed up without a signal, and
whether he did so or not, and in view of all the other facts
and circumstances, or whether the plaintiff was guilty of
contributory negligence, so that the court should have di-
rected a verdict for the defendant, we do not find it neces-
sary to decide, and we intimate no opinion on the point.

The evidence has been quite fully collated in order to
show the general state of the evidence, as bearing on the
effect of the instructions of the circuit judge.   There was
no evidence justifying the submission of the question of
negligence of the defendant on account of the condition of

the spur track, to the jury, as a substantive ground of recovery, as the court did by the instructions upon that subject, though evidence of the condition of the track, known to the engineer, might have a material bearing on the question of his negligence in running the engine. There was no evidence to go to the jury to show that the condition of the spur track was in any proper sense the proximate cause of the plaintiff's injury. The testimony of the plaintiff imputes his injury solely to the sudden reversal of the engine by the engineer; and the evidence of the engineer is to the effect that he had complete control of the engine, and after reversing it he could have run it back by giving his engine steam. If the alleged imperfect condition of the track was all the ground of recovery shown, it is, we think, impossible to maintain that the case should have been submitted to the jury. The instruction to the jury, in substance, that the alleged improper condition of the spur track was one of the two issues upon which the jury were to find, excepted to by the defendant, and the giving of the other instruction mentioned in the foregoing statement, in respect to the duty of the company in keeping a reasonably safe and convenient track, and "that if it neglected this duty, *and in consequence of such neglect* the plaintiff was injured while in the exercise of ordinary care," etc., " then the defendant is liable in damages to him for such injury, and your verdict must be for the plaintiff," left it for the jury to conjecture, and so find, that the condition of the track was a proximate cause of the injury, when there was no legitimate evidence before the jury upon which to base any such conclusion; and this instruction was made more specific and objectionable by the instruction that the employee of the company "does not assume the risks arising from the negligence of the defendant in failing to provide a suitable roadbed and track." These instructions had a

manifest tendency to mislead the jury; and they may have influenced the determination of the jury on the question of contributory negligence, and aided materially in turning the scale on that point against the defendant. The objection to the charge is, in substance, the same as in the case of *Heddles v. C. & N. W. R. Co.* 74 Wis. 240, 255, and cases cited on page 257; *Beery v. C. & N. W. R. Co.* 73 Wis. 197, 199.

The circuit judge, in instructing the jury on the subject of what would be considered due care, said that "it [due care] has relation to the situation of the parties and the business in which they are engaged, and varies according to the exigencies which require vigilance and attention, conforming in amount and degree to the particular circumstances under which it is to be exercised;" and then charged the jury, generally, that "where a plaintiff is compelled to act at once, in the presence of imminent danger, he cannot be held guilty of contributory negligence, as a matter of law, merely because he did not choose the best means of escape from the danger." The last instruction would be proper only where the plaintiff is brought in the presence of danger by and through the negligence and want of care of defendant or others. The instruction, as applied to the facts of this case, would leave the jury to conclude that if the plaintiff, in the emergency in which he found himself, chose the best means of escape that occurred to him, although not the best calculated in that particular exigency, this fact might exculpate and relieve him from the consequences of his contributory negligence, if they found that he had been guilty of such, by which he was brought into such a dangerous position. This instruction was misleading and erroneous.

These instructions were not applicable to the evidence and may have misled the jury. We cannot say that they

did not. For these reasons the judgment of the circuit court must be reversed, and a new trial granted.

*By the Court.*— The judgment of the circuit court is reversed, and the case remanded for a new trial.

NOTE.— By ch. 438, Laws of 1889, in force at the time the injury occurred, it is provided that "every railroad corporation doing business in this state shall be liable for damages sustained by any employee thereof within this state, without contributory negligence on his part, when such damage is caused by the negligence of any train dispatcher, telegraph operator, superintendent, yard master, conductor, or engineer, or of any other employee who has charge or control of any stationary signal, target point, block, or switch."